**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TIFFANY SCORZO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23-cv-3836** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **UNUM LIFE INSURANCE COMPANY** | ) | |
| **OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Tiffany Scorzo ("Scorzo"), a former store manager for Starbucks Corporation, brings this Employee Retirement Income Security Act ("ERISA") suit against her former employer's benefits administrator, defendant Unum Life Insurance Company of America ("Unum"). *See* 29 U.S.C. §1132(a)(1)(B). Scorzo challenges Unum's decision to deny her claim for long-term disability benefits under Starbucks' long-term disability plan, arguing that Unum improperly discounted the effect of her multiple sclerosis ("MS")[1] and her MS-related impairments on her ability to engage in a gainful occupation.

Pending before the Court are the parties' cross-motions for judgment. (Dckt. ##30, 37). The Court has carefully considered the arguments and evidence presented by the parties and, for the reasons set forth below, finds that Scorzo has not shown by a preponderance of the evidence that she is unable to perform *any* gainful occupation for which she is reasonably fitted by

---

[1] "Multiple sclerosis is a chronic, often disabling disease that attacks the central nervous system . . . , which is made up of the brain, spinal cord, and optic nerves. Symptoms may be mild, such as numbness in the limbs, or severe, such as paralysis or loss of vision. The progress, severity, and specific symptoms of MS are unpredictable and vary from one person to another." *MacNally v. Life Ins. Co. of N. Am.*, No. 07-CV-4432 PJS/JJG, 2009 WL 1458275, at *6 (D.Minn. May 26, 2009) (cleaned up).

education, training, or experience as required by the applicable group insurance plan.

Accordingly, Scorzo's motion for judgment, (Dckt. #30), is denied and Unum's cross-motion for judgment, (Dckt. #37), is granted.

## I.     LEGAL STANDARD

The parties agree that this case should be adjudicated on the administrative record under Federal Rule of Civil Procedure 52(a).  Rule 52(a) governs actions "tried on the facts without a jury" and requires the Court to "find the facts specially and state its conclusions of law separately."  Fed.R.Civ.P. 52(a).  Under Rule 52(a), the Court "reviews the stipulated record, resolves any disputes of fact, and determines the outcome of the case."  *Snapper v. Unum Life Ins. Co. of Am.*, 662 F.Supp.3d 804, 812 (N.D.Ill. 2023) (cleaned up).  "This procedure is essentially a trial on the papers . . . and is well-suited to ERISA cases in which the court reviews a closed record."  *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir. 2015).  A court will normally review a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The plan at issue does not provide Unum with discretionary authority and the parties agree that the *de novo* standard of judicial review applies to the present case.

In applying the *de novo* standard, the Court must independently determine based on the evidence in the record whether Scorzo is entitled to long-term disability benefits under her policy.  *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009); *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (same).  Under this standard, Scorzo, as the party seeking enforcement of the plan, bears the burden of proving her entitlement

2

to the plan's benefits by a preponderance of the evidence. *Ruttenberg v. U.S. Life Ins. Co. in City of New York, a Subsidiary of Am. Gen. Corp.*, 413 F.3d 652, 663 (7th Cir. 2005); *Daniliauskas v. Reliance Standard Life Ins. Co.*, No. 1:16-cv-9278, 2018 WL 1336051, at *3 (N.D.Ill. Mar. 14, 2018).

A showing that Scorzo's condition has remained constant or worsened, without evidence that the condition results in functional limitations, is not sufficient to meet this burden. *Artz v. Hartford Life & Accident Ins. Co.*, 100 F.4th 921, 931 (7th Cir. 2024) (requiring that evidence show, "in addition to the *existence* of symptoms, that the severity and persistency of those symptoms results in functional impairment . . .") (cleaned up) (emphasis in original). Moreover, any "doubts or gaps in the evidence" cannot be resolved in Scorzo's favor. *Cheney v. Standard Ins. Co.*, 831 F.3d 445, 451 (7th Cir. 2016); *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020) ("The plaintiff is the one who is obligated to prove she is entitled to benefits, so any gaps in the record cut against her claim."). As such, Scorzo "bears the burden of proving not that the plan administrator erred, but that she is entitled to the benefits she seeks." *Dorris*, 949 F.3d at 299.

## II. FINDINGS OF FACT

### A. Scorzo's Claim History Under Starbucks' Group Insurance Policy

As a Starbucks store manager, Scorzo was a covered participant under Starbucks' long-term disability plan (the "Plan"). (Dckt. #34 at 12). The Plan benefits were funded by a group insurance policy (the "Policy") that Unum issued to Starbucks. In October 2020, Scorzo indicated that she was unable to continue working due to symptoms she attributed to her MS, and she submitted a claim for disability benefits under the Policy. (Dckt. #34 at 2, 12; Dckt. #34-2 at 78).

3

The Policy sets out a two-tiered definition of disability for Starbucks employees like Scorzo. (Dckt. #35-2 at 17). In particular, the Policy provides that:

You are disabled when Unum determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

- you have a 20% or more loss in your **indexed basic monthly earnings** due to the same sickness or injury.

You will continue to receive payments beyond 24 months if you are also:

- working in any occupation and continue to have a 20% or more loss in your **indexed basis monthly earnings** due to your sickness or injury; or

- not working and, due to the same sickness or injury, are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(*Id.*) (emphasis in original). The Policy permits Unum to stop benefits "on the date the [individual] is no longer disabled under the terms of the plan." (*Id.* at 24).

Unum approved Scorzo's claim and her benefits payments were effective as of February 13, 2021. (Dckt. #34-2 at 37). Unum continued to approve Scorzo's disability benefits for approximately two years. (Dckt. #34-7 at 35). On January 31, 2023, Unum sent Scorzo a letter explaining that it would "not be able to continue payment of th[o]se benefits." (*Id.*). The letter specifically provided:

We have determined you are not precluded from performing the duties of alternative, gainful occupations. Because you are no longer disabled according to the policy as of February 13, 2023, benefits are no longer payable.

(*Id.* at 36). The letter further stated that based on Scorzo's "work history, education and experience" she was qualified to "perform alternative gainful sedentary occupations." (*Id.*).

4

### B.     Medical Evidence

The administrative record in this case is voluminous, totaling over 1,200 pages.  The Court summarizes only the relevant portions of the record.

#### 1.     Scorzo's Treating Physicians

#### a.     Dr. Hernandez-Peraza

Scorzo was diagnosed with MS in January 2016, (Dckt. #34 at 14) and worked as a Starbucks store manager until August 2020, (*id.* at 63).  In late August 2020, Starbucks sent a Request for Medical Information to Zulma Hernandez-Peraza, M.D., a neurology and MS specialist, who had treated Scorzo on several prior occasions.  (*Id.* at 72–75).  During her visit with Dr. Hernandez-Peraza, Scorzo reported, among other things, pain and tingling in her hands and feet.  (*Id.* at 74).  Dr. Hernandez-Peraza completed an "Attending Physician Statement" dated September 2, 2020, which asked her to determine whether Scorzo had "recovered significantly to return" to her job at Starbucks.  (*Id.* at 73–75).  Dr. Hernandez-Peraza checked "no."  (*Id.* at 73).  The form also asked Dr. Hernandez-Peraza whether Scorzo was "unable to perform any of [her] job functions due to [her] condition."  (*Id.*).  Dr. Hernandez-Peraza checked "yes," and identified those job functions as "lifting heavy weights, [and] near frequent breaks due to fatigue."  (*Id.*).  Under the section that asked her to "describe other relevant medical facts . . . related to the condition for which [Scorzo sought] leave," Dr. Hernandez-Peraza wrote "unable to concentrate, [and] unable to maintain fast pace required for her job."  (*Id.*).  Dr. Hernandez-Peraza reaffirmed these findings on September 22, 2020.  (*Id.* at 84–86).

Dr. Hernandez-Peraza continued to treat Scorzo for the next several years.  For example, Scorzo presented for an office visit with Dr. Hernandez-Peraza on December 14, 2021.  (Dckt. #34-4 at 97).  Scorzo's record indicated that she was last seen by Dr. Hernandez-Peraza a year

earlier on December 15, 2020 for a telehealth appointment. (*Id.* at 98). At her December 2021 appointment, Scorzo "denie[d] any flairs (*sic*) or new symptoms," and her attention and "coordination" were accessed as "normal." (*Id.* at 98–99). Dr. Hernandez-Peraza documented that Scorzo had "no focal deficits on exam and no new symptoms per patient." (*Id.* at 101). Scorzo also "denie[d] any new numbness, tingling, weakness, or vision changes." (*Id.* at 97). That said, Dr. Hernandez-Peraza did note that Scorzo had "problems with verbal recognition," (*id.* at 101), in addition to "impaired processing speed [and] executive function," (*id.* at 97). She further noted that Scorzo stated she did not wish to be on medication or disease-modifying therapy ("DMTs"). (*Id.*).

Scorzo continued to follow up with Dr. Hernandez-Peraza, including via a telehealth appointment on June 21, 2022. (Dckt. #34-5 at 88–92). Dr. Hernandez-Peraza indicated that Scorzo reported "spasm[s] after walking," (*id.* at 89), but also noted that Scorzo's recent MRI (taken in March 2022 and discussed in greater detail below), showed, according to Dr. Hernandez-Peraza, "stab[ility] with generalized brain atrophy," (*id.* at 92). Dr. Hernandez-Peraza also acknowledged that Scorzo underwent a disability evaluation in April 2022 (discussed in greater detail below) that showed weakness. (*Id.*). Scorzo's neurological review was negative for each of the following symptoms: pain, numbness or tingling, confusion, memory loss, speech disorder, weakness, muscle twitching or cramping, or vision problems. (*Id.* at 89).

On November 1, 2022, Scorzo attended another telehealth appointment with Dr. Hernandez-Peraza. (Dckt. #34-6 at 26–30). It was reported that Scorzo's memory loss was the "same" and that she was having "some word finding difficulties." (*Id.* at 26). Dr. Hernandez-Peraza again indicated that Scorzo experienced "spasm[s] after walking." (*Id.* at 27). It was further noted that Scorzo still had no interest in DMTs. (*Id.*) Scorzo's numbness and tingling

were reported as "stable" and she was again negative for pain, confusion, speech disorder, weakness, muscle twitching or cramping, or vision problems. (*Id.* at 26).

On December 6, 2022, Unum sent a request to Dr. Hernandez-Peraza for opinions regarding Scorzo's ability to perform alternative occupational demands. (Dckt. #34-6 at 71–72). The following day, Unum wrote to Dr. Hernandez-Peraza, stating that "we need clarification regarding [] Scorzo's work capacity within the following occupational demands[:] . . . sedentary demands requiring exertion of up to 10 pounds and frequent reaching (desk level), handling, and fingering; as well as frequent near acuity, occasional far acuity, color vision." (*Id.* at 113). Unum asked Dr. Hernandez-Peraza if Scorzo "[was] able to perform the above occupational demands on a full-time basis" and requested that Dr. Hernandez-Peraza identify Scorzo's "current restrictions (activities the patient should not do) and limitations (activities the patient cannot do)." (*Id.*).

Dr. Hernandez-Peraza responded to Unum's letter on December 20, 2022. (*Id.*). In response to the question "[i]s [Scorzo] able to perform the above occupational demands on a full-time basis," Dr. Hernandez-Peraza put an "X" next to "No" and stated, "[h]er attention & cognitive deficits make this difficult for function." (*Id.*). Dr. Hernandez-Peraza did not respond to the question asking for Scorzo's restrictions and limitations. (*Id.*).

On January 10, 2023, Dr. Hernandez-Peraza responded to a second letter issued on behalf of Unum, this time by Stephen Leverett, D.O. (*Id.* at 144–50). In response to the question "Do you agree that [Scorzo] has the functional capacity to perform the occupational demands as [follows] . . . on a full-time basis[:] . . . mostly sitting; exertion up to 10 pounds of force occasionally; and frequent reaching at desk level, handling, and fingering; and visual demands including frequent near acuity, frequent accommodation, occasional far acuity, color vision," Dr.

Hernandez-Peraza put an "X" next to "No" and wrote, "[s]he is not asymptomatic, as her memory impairments are most likely secondary to MS. The description above does not include the definitions of the mental requirements of a new job. I am unable to certify if Ms. Scorzo would be able to learn a new task and perform the occupational demands of full time [work]." (*Id.* at 145).

### b.      Drs. Armstrong and Tucci

Scorzo underwent a clinical neuropsychological evaluation that took place over four days on October 13, October 15, October 22, and November 2, 2020. (Dckt. #34-1 at 89–95). The evaluation, which was conducted by Nickolas Armstrong, Psy.D., and Anthony Tucci, Ph.D., included "an assessment of [Scorzo's] current cognitive and emotional functioning . . . ." (*Id.* at 89). Drs. Armstrong and Tucci's report noted that Scorzo's medical history was "remarkable for [MS], optic neuritis, and allergies," and that she was reluctant to take medications suggested by her doctor. (*Id.* at 89, 100).

> After the cognitive testing was complete, Drs. Armstrong and Tucci concluded that:
>
> Mrs. Scorzo's cognitive testing is notable for consistent difficulties on tasks of verbal reasoning and language, with inconsistent difficulties seen on tasks of processing speed, executive functioning, and memory. This score pattern represents a very likely decline in ability, particularly verbal reasoning, from prior functioning. While unusual to exhibit the most consistent difficulties primarily in the area of verbal reasoning, multiple sclerosis can produce atypical patterns of difficulties. Given the history of new lesions in the context of currently intact activities of daily living, this information likely suggests a **Mild Neurocognitive Disorder Due to Another Medical Condition (Multiple Sclerosis).**

(*Id.* at 116) (emphasis in original). Notably, at the end of Scorzo's evaluation, Drs. Armstrong and Tucci "encouraged [her] to reconsider use of an MS medication . . . ." (*Id.* at 94).

8

### c. Dr. Alana Biggers

In September 2022, Scorzo presented to Dr. Alana Biggers, M.D., to obtain labs and vitals so that she could receive coverage under her husband's health insurance plan. (Dckt. #34-6 at 3). Dr. Biggers noted that Scorzo's "MS [wa]s well controlled," that Scorzo was "on no medications for MS," and that she had "no symptoms currently." (*Id.*). Scorzo reported that during a flare, her symptoms included tingling in her hands and loss of vision in her right eye. (*Id.*). Dr. Biggers otherwise documented that Scorzo's musculoskeletal range of motion, reflexes, speech, behavior, judgment, and mood were all normal. (*Id.* at 7). Scorzo was also negative for back pain, neck pain, dizziness, weakness, and confusion. (*Id.* at 4).

### d. Dr. Peter MacIntosh

Scorzo attended a neuro-ophthalmology evaluation with Peter MacIntosh, M.D., on March 1, 2023.[2] (Dckt. #36 at 9). Dr. MacIntosh reported that Scorzo's vision was stable, but noted that her optic neuritis caused blurred vision when stressed or experiencing fatigue. (*Id.*). He also noted that Scorzo was not on any medications. (*Id.*).

### e. Woojin Song, Ph.D.

Scorzo underwent updated neuropsychological testing with Woojin Song, Ph.D., on June 8, 2023. (*Id.* at 16). Scorzo "denied [a] history of mental health problems or treatments." (*Id.* at 18). Dr. Song's impressions were that Scorzo had a "stable disease burden" and "no new enhancing lesions," although she reported "slightly greater cerebral volume loss than expected for patient's age consistent with history of MS." (*Id.* at 17). Dr. Song explained "[t]his has

---

[2] The Court considers evidence of Scorzo's continued treatment after February 13, 2023 (the determination date) and finds that such evidence "is relevant to the extent that it may reflect on [Scorzo's] impairments" as of February 13, 2023. *Jones v. Saul*, 823 Fed.Appx. 434, 439 (7th Cir. 2020) (citing cases).

progressively increased when compared to multiple studies with the earliest occurring in January 19, 2017." (*Id.* at 17–18). Dr. Song further assessed that, "[o]verall, [Scorzo's] cognitive skills were commensurate with her intellectual ability and broadly within normal limits, with strengths and weaknesses." (*Id.* at 20). Although there were some minor improvements compared to Scorzo's 2020 neuropsychological testing results, Scorzo scored "impaired" or "borderline impaired" in several categories (e.g., complex figure delayed recall, confrontation naming, speed fine motor dexterity). (*Id.* at 19–20). Dr. Song noted, "when compared to her previous evaluation results in 2020, [Scorzo] demonstrated clinically significant improvements across her verbal skills," but that she "demonstrated some decline in . . . her planning and organization of a complex visuospatial figure . . . ." (*Id.* at 21). Dr. Song opined that "[d]espite significant progressive cerebral volume loss seen on her most recent MRI of the brain, [Scorzo's] cognitive and intellectual skills [we]re generally within expectations for her." (*Id.* at 21). Dr. Song also noted that Scorzo had "never been on any [DMT]" although she had been "offered [them] multiple times over the years." (*Id.* at 17).

### f. Dr. Parisa Hassanzadeh

On January 12, 2024, Scorzo began treatment with Parisa Hassanzadeh, M.D., a neurologist. (Dckt. #36 at 24–29). Scorzo believed she was reaching the "progressive phase" of MS, because she was not able to walk the same distances that she could one year prior. (*Id.* at 24). Dr. Hassanzadeh reviewed Scorzo's neuropsychological testing results and determined Scorzo "continued to meet diagnostic criteria for mild neurocognitive disorder due to another medical condition," (i.e., MS). (*Id.* at 28). Dr. Hassanzadeh further noted that Scorzo was "not interested in DMT[s]." (*Id.* at 24). She also reported that Scorzo's MRIs demonstrated that she was "stable with no new lesions and continue[d] to show atrophy with progression." (*Id.*).

10

Furthermore, she stated that Scorzo had no "clinical activity" for MS "despite being off med[ications]." (*Id.* at 28).

### 2. Non-Treating Physicians

#### a. Dr. Rhithika Kohli

Unum sent a request to Rhithika Kohli, M.D., D.N.B., seeking her opinion about Scorzo's capacity to perform certain occupational demands. (Dckt. #34-6 at 124–28). In her report dated December 31, 2022, Dr. Kohli opined that the "[a]vailable information [did] not support [a finding] that [Scorzo] would be physically or cognitively precluded from [work that was] primarily seated [and] require[ed] exertion [of] up to 10 lbs. and frequent reaching (desk level), handling, fingering." (*Id.* at 127). Dr. Kohli acknowledged Scorzo's medical history with MS and optic neuritis, but noted that (1) Scorzo was generally asymptomatic in September and November 2022; (2) the MRI of her brain was stable, although it did show brain atrophy; (3) her MS was well-controlled; and (4) she was not taking any medications or DMTs, which indicated that her status was "stable." (*Id.*).

Dr. Kohli also recognized Scorzo's memory problems but noted that she had not undergone any formal testing since October 2020. (*Id.*). Dr. Kohli opined that the frequency of office visits and "overall intensity of treatment (not taking any meds for MS) indicate[d] status [wa]s stable." (*Id.*). According to Dr. Kohli, "the available med[ical] records d[id] not show any . . . changes in attention/concentration, mood or memory that would substantiate cognitive impairment to a level that would preclude [Scorzo] from her occ[upational] duties." (*Id.*). Dr. Kohli concluded that Scorzo's other conditions, including her "history of optic neuritis, . . . [we]re controlled/managed and d[id] not appear to be rising to the level that would preclude [Scorzo] from primarily seated level of occ[upational] demands." (*Id.*).

11

### b. Dr. Stephen Leverett

On January 3, 2023, Unum sent a request to Stephen Leverett, D.O., seeking his opinion about Scorzo's capacity to perform certain occupational demands. (*Id.* at 136). Before issuing his report, Dr. Leverett sent a January 6, 2023 letter to Dr. Hernandez-Peraza on behalf of Unum. (*Id.* at 138–40). In his letter, Dr. Leverett stated he had "reviewed the file" and found the "information [to be] consistent with the medically reasonable conclusion that [Scorzo had] the functioning capacity to perform the [following] occupational demands . . . on a full-time basis[:] . . . mostly sitting; exertion up to 10 pounds of force occasionally; and frequent reaching at desk level, handling, and fingering; and visual demands including frequent near acuity, frequent accommodation, occasional far acuity, color vision." (*Id.* at 139). He then asked "[d]o you agree that [Scorzo] has the functional capacity to perform the occupational demands as outlined above on a full-time basis?" (*Id.*). As set forth above, Dr. Hernandez-Peraza put an "X" next to "No" and wrote, "[s]he is not asymptomatic, as her memory impairments are most likely secondary to MS. The description above does not include the definitions of the mental requirements of a new job. I am unable to certify if Ms. Scorzo would be able to learn a new task and perform the occupational demands of full time [work]." (*Id.* at 145).

Dr. Leverett then authored a report, dated January 13, 2023, in which he expressed an opinion that differed from the opinion of Dr. Hernandez-Peraza and concluded that "the available information [did] not support a physical and/or cognitive impairment that would preclude [Scorzo] from performing the above-listed alternative sedentary occupational demands from February 13, 2023 ongoing." (Dckt. #34-7 at 8). Dr. Leverett acknowledged Dr. Hernandez-Peraza's opinions, but concluded that they were "not well supported by medically acceptable clinical standards, laboratory or diagnostic techniques and [we]re inconsistent with the other

12

substantial evidence in the file." (*Id.* at 9). Like Dr. Kohli, Dr. Leverett acknowledged that Scorzo's memory testing in 2020 showed "some findings of cognitive difficulties," (*id.* at 4), but opined that the evidence did not support a loss of functional capacity from a cognitive standpoint, based on his assessment that the "clinical descriptions of [Scorzo's] cognitive status [did] not portray [her] as with significant cognitive insufficiencies," (*id.* at 8). Dr. Leverett explained that Scorzo's "MS ha[d] been stable and asymptomatic off disease modifying therapy," and that her evaluations and clinical examinations in 2021 and 2022 showed "no focal deficits," "unremarkable physical examination," "normal range of motion," and "normal mood, affect, speech, behavior, and judgment." (*Id.* at 5). Dr. Leverett also opined that Scorzo did not have "loss in functional capacity from a mental illness/cognitive standpoint." (*Id.* at 8). He explained that the "[c]linical descriptions of [Scorzo's] cognitive status d[id] not portray [her] as with significant cognitive inefficiencies." (*Id.*).

 In sum, Dr. Leverett opined:

> Based on a reasonable degree of medical certainty, and considering all conditions either alone or in aggregate, there is no physical or cognitive condition or combination of physical or cognitive conditions that would reasonably preclude the Insured from being able to perform mostly sitting; occasional exertion of up to 10 pounds of force; brief periods of standing and walking; frequent reaching at desk level, handling and fingering; visual frequent near acuity and accommodation; and occasional far acuity and color vision on a full-time sustained basis as of February 13, 2023.

(*Id.* at 22–23).

### c.    Dr. Vaughn Cohan

In his January 19, 2023 report, Vaughn Cohan, M.D., considered the opinions of Dr. Hernandez-Peraza, Dr. Leverett, and vocational consultant Cjeska Howard (whose opinion is discussed below), as well as Scorzo's medical record. (*Id.* at 18). Dr. Cohan expressly took note of Scorzo's "multiple conditions" as well as her "self-reported symptoms" but ultimately

13

determined that "the physical examination and diagnostic findings d[id] not identify a significant abnormality that would rise to the inability to function within the outlined occupational demands which are performed at a sedentary level." (*Id.* at 19). He further noted that although Scorzo had reported "some struggles with cognition, no definitive abnormalities [had] been reported on examination at the bedside." (*Id.* at 18–19).

Dr. Cohan also acknowledged that the October and November 2020 testing by Drs. Tucci and Armstrong "revealed mild neurocognitive disorder," but found that the test results were "variable and atypical." (*Id.* at 19). Dr. Cohan then stated that he was "in agreement with the . . . opinion of Dr. Leverett" that Scorzo did not have a "physical and/or cognitive impairment that would preclude [her] from performing the [relevant] alternative sedentary occupational demands from February 13, 2023 ongoing." (*Id.* at 18). He explained that while Scorzo "ha[d] multiple conditions and her self-reported symptoms [we]re taken into consideration, the physical examination and diagnostic findings d[id] not identify a significant abnormality that would rise to the inability to function within the outlined occupational demands which are performed at a sedentary level." (*Id.* at 19).

### d.      Dr. Anthony Geraci

Unum sent a request to Anthony Geraci, M.D., seeking his opinion about Scorzo's capacity to perform occupational demands subject to certain sedentary work requirements. (*Id.* at 133). In addition to restrictions about standing, lifting, reaching, and acuity, the work requirements also included performing duties that involved "different . . . degrees of attentiveness without loss of efficiency or composure." (*Id.*).

In his report dated April 28, 2023, Dr. Geraci opined that "the available medical and file information [did] not support [restrictions and limitations] that preclude[d Scorzo] from

14

performing gainful occupational demands" of sedentary work as of February 13, 2023. (*Id.* at 133). In support of his conclusion, Dr. Geraci indicated that he had "completed a full review of the medical record," and had "performed [his] own independent analysis of the medical records and formed [his] own conclusions." (*Id.* at 134). Dr. Geraci recognized that an MRI from March 15, 2023 showed that Scorzo was "stable with no new lesions." (*Id.* at 135). He further noted that Scorzo's 2022 MRI showed an "active lesion," but clarified that it was "not clinically relevant" because "mild atrophy, which is often seen in patients with MS, . . . is not, in and of itself, a marker for disease activity, symptoms, or impairment." (*Id.*).

Dr. Geraci further noted that although Scorzo "states she has inconsistent eyesight, speech, bowel incontinence, memory, muscle tightness, weakness, fatigue, trouble communicating, frontal lobe brain damage, difficulty walking or standing at times," "none of [these symptoms we]re documented in the medical records." (*Id.*). Dr. Geraci also pointed out that "during almost three years of follow up with her neurologist [Scorzo] report[ed] no symptoms of MS other than cognitive issues" and "repeatedly decline[d DMTs] . . . indicating a benign course of [MS]." (*Id.* at 139–40). Finally, Dr. Geraci acknowledged that Scorzo stated that "she has issues with short-term and long term memory loss," but found that these statements were "refuted by normal mental status examinations and the neuropsychological testing in October and November 2020." (*Id.* at 140).

In sum, Dr. Geraci opined that "[t]he facts in the medical record, including her lack of symptoms over three years, infrequent follow-up with her neurologist, and lack of DMT, indicate her MS [wa]s not active." (*Id.*).

### 3. Vocational Experts

#### a. Cjeska Howard, Vocational Consultant

Unum consulted with Cjeska Howard, a vocational consultant, and asked her to opine whether Scorzo had the "skills for other gainful occupations . . . ." (*Id.* at 13). In her January 18, 2023 report, Howard indicated that she considered the availability of occupations which were limited to sedentary work, including: "[o]ccasional exertion up to [ten pounds], performed mostly seated with brief periods of standing; frequent reaching (desk level), handling, fingering." (*Id.* at 13). She also considered "visual demands" including "frequent near acuity, frequent accommodation, occasional far acuity, color vision." (*Id.*). Howard concluded that "the occupation of an Employment Interviewer [wa]s a viable alternative option [for Scorzo]." (*Id.* at 14). Howard made it clear that "this is an example and is not intended to constitute a complete list of occupation[s] Ms. Scorzo can perform." (*Id.*).

#### b. Shannon O'Kelley, Vocational Consultant

On April 18, 2023, Unum asked Shannon O'Kelley to "provide further assessment of the other gainful occupations . . . ." (*Id.* at 129). In his report, dated two days later, O'Kelley explained that based on Scorzo's work history, and the restrictions and limitations provided— (again, lifting no more than ten pounds, performed mostly seated with brief periods of standing and frequent reaching (desk level), handling, fingering, as well as frequent near acuity, frequent accommodation, occasional far acuity, color vision)—that "vocational options [for Scorzo] included telemarketing supervisor, call center supervisor, and account supervisor." (*Id.*).

### 4. Physical Therapy

On April 14, 2022, Scorzo presented for a "Physical Functional Assessment Summary for Disability Evaluation Purposes" with Lauren Grieco, PT. (Dckt. #34-5 at 22–29). Scorzo

16

reported she was having increased difficulty standing and walking for long periods of time, increased pain, and muscle weakness. (*Id.* at 26). She also indicated that stress was a trigger for her MS. (*Id.*). Scorzo further reported her MS symptoms were unpredictable, her body would shut down, she could not move and/or her eyesight would diminish or "go absent." (*Id.*). The functional assessment demonstrated that Scorzo's range of motion was generally within functional limits; for example, her manual muscle testing indicted she was at 4-5/5 in her shoulders, elbows, wrists, hips, knees, and ankles. (*Id.* at 28). There was tightness and pain in some areas, and her grip strength was in the twenty-fifth percentile. (*Id.* at 27–28).

### 5. Scorzo's MRI Evidence

The record contains evidence that Scorzo underwent the following MRIs:

(a) On June 10, 2020, Scorzo had a brain MRI with and without contrast. (Dckt. #34 at 77). The MRI revealed "lesions within the periventricular, centrum" and "major white matter, which appeared increased in number compared to the prior study from 3/20/2019, which may be seen in a demyelinating disease such as multiple sclerosis." (*Id.*);

(b) On March 3, 2021, Scorzo underwent another MRI. (Dckt. #34-2 at 83). The results showed that Scorzo had a "new lesion" which "demonstrate[d] enhancement suggestive of active demyelinating disease." (*Id.*);

(c) On March 15, 2022, Scorzo underwent a brain MRI with and without contrast. (Dckt. #34-5 at 55). The results indicated "[s]table disease burden with no new lesions. There are no findings to suggest active disease." (*Id.*);

(d) On March 15, 2023, she underwent another MRI which revealed she was stable with "no new lesions" and that she continued to "show atrophy with progression." (Dckt. #34-7

at 102).  Her numbness, tingling, and fatigue were recorded as "stable," and her memory loss

was recorded as "same."  (*Id.* at 102–03); and

(e)  Scorzo underwent another MRI in February 2024, which showed "stable size and

distribution of demyelinating plaques."  (Dckt. #36 at 31).  The MRI impressions indicated that

"the contrast-enhanced images [we]re negative for signal change to localize active

demyelination."  (*Id.*).

### 6. Social Security Disability Insurance Benefits Denial

Scorzo applied for payment of Social Security Disability Insurance benefits from the

Social Security Administration ("SSA").  (Dckt. #34-6 at 82).  The SSA denied her claim at the

initial level, on reconsideration, and again on appeal following a hearing before an

Administrative Law Judge ("ALJ"), who issued a written decision on November 28, 2022.

(Dckt. #34-6 at 82–99).  Although the ALJ recognized that Scorzo had relapsing remitting

multiple sclerosis, he nonetheless found that she "ha[d] the residual functional capacity to

perform less than the full range of light work as defined in 20 CFR 404.1567(b)."  (Dckt. #36-4

at 89).  Relying on the testimony of a vocational expert, the ALJ also determined that while

Scorzo was "unable to perform any past relevant work," she had the functional capacity to

perform alternative "representative occupations," including mail clerk, merchandise marker, and

office helper.  (*Id.* at 98).  The ALJ further found, "[b]ased on the testimony of the vocational

expert, [and] considering [Scorzo]'s age, education, work experience, and residual functional

18

capacity, [that she was] capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.*).

### 7. Scorzo's Calls with Unum

Throughout the course of her medical treatment, Scorzo participated in regular calls with Unum. (*See, e.g.*, ##34-2 at 74–78, 86–87, 105; 34-3 at 125, 135). During these calls, Scorzo reported symptoms she attributes to her MS, including tingling, muscle weakness, bladder issues, blurry vision, and stiffness. (*Id.*).

## III. CONCLUSIONS OF LAW

The issue before the Court is whether Scorzo has met her burden to show by a preponderance of the evidence that she was not working and unable to perform the duties of *any* gainful occupation for which she was reasonably fitted by education, training, or experience as of February 13, 2023 (the determination date), and was therefore entitled to long-term disability benefits under the Policy.

### A. The Standard for Obtaining Benefits Under the Policy's General Disability Provision

The Policy contains two distinct disability periods under which Scorzo could obtain disability benefits. The first period was triggered by an "occupational" disability provision which allowed Scorzo to obtain disability benefits for the first twenty-four months during which she was unable to perform the duties of her regular position. (Dckt. #35-2 at 17); *see Hammond v. Fid. & Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992) ("An 'occupational' disability policy provides benefits if the claimant is unable to perform his regular job."). It is undisputed

19

that Scorzo received disability payments for the first twenty-four months during which she was unable to perform her job, and this provision of the Policy is therefore not at issue.

The Policy's second disability period, which kicks in after twenty-four months, is controlled by a "general disability provision" under which Scorzo would be entitled to benefits if, "due to sickness or injury," she was "unable to perform the duties of any gainful occupation for which [she was] reasonably fitted by education, training, or experience." (Dckt. 35-2 at 17); *Hammond*, 965 F.2d at 430–31 (noting that "a 'general' disability provision provides benefits if the claimant is unable to perform *any* job for which he is qualified by reason of education, training or experience.") (emphasis in original); *Smith v. Equitable Life Assur. Soc. of U.S.*, 67 F.3d 611, 616 (7th Cir. 1995) (same). The parties disagree regarding how the Policy's general disability provision should be construed.

Scorzo argues that the Policy's general disability provision must be interpreted in accordance with her reasonable expectations, *see Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 668 n.19 (7th Cir. 2005), and that "a gainful occupation is one where the insured's earnings allow her to maintain the same 'station in life' and standard of living . . . [because] it would be patently unreasonable to withhold disability benefits from a skilled worker just because she could engage in some form of unskilled work, such as running a news stand or working as a day laborer." (Dckt. #32 at 15) (citing *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1007 (9th Cir. 2004) and *Erreca v. Western States Life Ins. Co.*, 19 Cal.2d 388, 394–95 (Cal. 1942)). Scorzo further notes that Unum itself interprets "the term 'gainful occupation' to be an 'occupation that is or can be expected to provide [her] with an income within 12 months

that is equal to or greater than 60% of her indexed-predisability earnings,'" and she seeks to have the Court apply this replacement income threshold.  (Dckt. #32 at 14, *quoting* Dckt. #34 at 20).

In response, Unum asserts that nothing in the Policy requires that an occupation must maintain Scorzo at her "station in life" in order to be "gainful."  (Dckt. #45 at 10).  The Court agrees, and it finds that the cases that Scorzo relies upon to support her "station in life" standard are inapposite for three reasons.  First, the standard applied by the California Supreme Court in *Erreca*, and by the Ninth Circuit in *Hangarter*, concerned breach of contract claims under California law and, as such, did not involve ERISA claims.  *See Erreca*, 19 Cal.2d at 390; *Hangarter*, 373 F.3d at 1003.  This is a crucial distinction since "[t]he *Erreca* standard . . . does not apply in ERISA cases because it is preempted."  *See, e.g.*, *Smith v. Hartford Life & Accident*, No. C 11-03495 LB, 2013 WL 394185, at *17 (N.D.Cal. Jan. 30, 2013); *Ramos v. United Omaha Life Ins. Co.*, No. C 12-3761 PJH, 2013 WL 60985, at *7 (N.D.Cal. Jan. 3, 2013) (citing *Erreca* and holding that "California's definition of 'total disability' is not applicable to an ERISA disability insurance policy").

Second, the *Erreca* standard would not apply here even if it weren't preempted because that standard was used to mitigate the "harshness" that might otherwise result from construing a general disability clause that "define[d] total disability to mean 'whenever the insured is wholly incapacitated from performing any work whatsoever for remuneration or profit'" in a "strict and literal" manner.  *Erreca*, 19 Cal.2d at 393–95.  By contrast, the Policy here qualifies (and softens) the "any occupation" language by limiting it to "any occupation" that Scorzo is reasonably fitted for by education, training, or experience.  As such, there is no need for the *Erreca* standard in this case even under the California Supreme Court's rationale.  *See Erreca*, 19 Cal.2d at 394 (citing with approval courts that "have held that total disability exists, within

21

the meaning of the term 'any occupation' as contained in a general disability clause, whenever the insured is incapacitated from following any substantial or remunerative occupation for which he is fitted or qualified, mentally or physically, and by which he is able to earn a livelihood").

Third, Scorzo's assertion that she had a "reasonable expectation" that the Policy would be construed in a manner to provide her with disability benefits unless she was able to find work in an occupation that maintained her "station in life" is unpersuasive. As the Seventh Circuit has made clear, "the reasonable-expectation doctrine is related to actual reliance by the employee," *Cheney v. Standard Ins. Co.*, 831 F.3d 445, 453 (7th Cir. 2016), and Scorzo has produced no evidence that she actually relied on the construction of the Policy that she urges the Court to adopt. *See also Pannebecker v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1213, 1219 (9th Cir. 2008) ("Although the Plan does not require Liberty to consider a claimant's current salary or station in life in making a disability determination, Pannebecker asks us to import those qualifications into the Plan's terms. We decline to do so.").

Finally, the fact that Unum, in administering Scorzo's claim, considered a gainful occupation to be one that would provide Scorzo with earnings equal to or greater than 60% of her pre-disability earnings does not import that income threshold into the Policy. *See, e.g.*, *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 960–61 (7th Cir. 2001). In *O'Reilly*, as here, the insurer considered whether the claimant could earn at least 60% of his pre-disability income when determining whether he was disabled. *Id.* Nonetheless, the Seventh Circuit held that "the inability to earn 60% of pre-disability income is neither a necessary nor a sufficient condition of a total disability finding" when "there is no replacement income standard of any kind" in the ERISA plan. *Id.* at 961; *Pannebecker*, 542 F.3d at 1219 (same); *Caraba v. Paul Revere Life Ins. Co.*, No. 21 C 4682, 2024 WL 3823151, at *5, 6 (N.D.Ill. Aug. 14, 2024)

22

(rejecting plaintiff's claim "that he was not gainfully employed because he did not earn at least 60% of his pre-disability income following his disability"); *cf. Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 363 (7th Cir. 2017) (applying 60% pre-disability earnings standard where the policy specifically used that language).  As in *O'Reilly*, the general disability provision at issue here does not include a replacement income standard, and this Court will not import one into the Policy.

For these reasons, the Court rejects Scorzo's proposed construction of the Policy's general disability provision.  Instead, the Court will apply federal common law rules of contract interpretation to construe the general disability provision by "interpret[ing] the terms of the policy in an ordinary and popular sense as would a [person] of average intelligence and experience." *Hammond*, 965 F.2d at 430 (cleaned up); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461–62 (7th Cir. 1997) (same).  As such, the Court will determine whether Scorzo has proven by a preponderance of the evidence that she is unable to perform the duties of any gainful occupation for which she is reasonably fitted by education, training, or experience.  *See, e.g.*, *Pannebecker*, 542 F.3d at 1219 (noting that the Ninth Circuit interprets a general disability provision's "language to mean what it said: a claimant was not disabled if he could perform any job for which he was qualified by training, education, or experience"); *see also Ghazi v. Fiserv, Inc.*, 957 F.Supp. 167, 169 (N.D.Ill. 1997), *quoting Helms v. Monsanto Co.*, 728 F.2d 1416, 1421–22 (11th Cir. 1984) ("'Gainful' means 'any occupation from which [the insured can] earn a reasonably substantial income rising to the dignity of an income or livelihood.'").

"[T]he language of the 'any occupation' standard is not demanding," *id.* (cleaned up), and Scorzo's burden to overcome it "is an especially heavy one." *Rodriguez v. Reliance Standard Life Ins. Co.*, No. 2:12-CV-04810 DMC, 2014 WL 347884, at *3 (D.N.J. Jan. 31, 2014), *aff'd*,

599 F. App'x. 423 (3d Cir. 2015).  Nonetheless, the Court is mindful of the Seventh Circuit's admonition that "'general' disability provisions should not be construed so literally that an individual must be utterly helpless to be considered disabled." *Hammond*, 965 F.2d at 431.  The Court will also consider whether Scorzo is able to perform an occupation that will enable her to earn at least 60% of her pre-disability income as "one factor in guiding its total disability decision." *O'Reilly*, 272 F.3d at 961 (noting that the inability to earn at least 60% of pre-disability income is a factor that weighs in favor of a finding of total disability).

**B.      Scorzo Has Not Met Her Burden of Proving That She Is Disabled Within the Meaning of the Policy's General Disability Provision.**

**1.      The Evidence Relied on by Scorzo Is Inconclusive and Is Undermined by Other Persuasive Evidence in the Record**.

Scorzo primarily relies on three sources of evidence to argue that she cannot perform any gainful occupation under the Policy's general disability provision: (1) the opinions of Dr. Hernandez-Peraza; (2) her various neurophysiological evaluations; and (3) her self-reported symptoms.  However, this evidence, when taken as a whole, does not satisfy Scorzo's burden of showing that she was unable to perform the duties of any gainful occupation for which she was reasonably fitted by education, training, or experience, as the Policy requires.  Moreover, the evidence that Scorzo relies on is undermined by other persuasive evidence showing that Scorzo *is* able to perform the duties of gainful occupations that she is reasonably fitted for.

**a.      Opinions of Dr. Hernandez-Peraza**

To begin, Scorzo asserts that Dr. Hernandez-Peraza "concluded that [she] remained unable to work in any capacity" after the initial twenty-four month disability period elapsed. (Dckt. #42 at 3–4).  This argument fails for two reasons.  First, the evidence Scorzo cites in support of this assertion does not contain an opinion about Scorzo's work capacity.  (PSOF Resp.

24

¶¶35, 60).  Instead, it simply notes that her MRIs showed atrophy, which both Drs. Song and Geraci opined did *not* affect Scorzo's functionality.  (Dckt. #34-7 at 135; Dckt. #36 at 21). Second, and contrary to Scorzo's assertion otherwise, Dr. Hernandez-Peraza never opined that Scorzo "could not work." (Dckt. #42 at 11).

To recap, Dr. Hernandez-Peraza opined about Scorzo's functional capacity for work on three occasions:

First, in her September 2, 2020 Attending Physician's Statement, Dr. Hernandez-Peraza opined that Scorzo had not "recovered sufficiently to return to work," and was "unable to perform . . . [certain of her] job functions due to her condition."  (*Id.* at 73).  That 2020 opinion—which was confined to whether Scorzo could perform the job functions of her then-current job as a store manager—has limited probative value on the question of whether she was unable to perform the duties of *any* gainful employment for which she was reasonably fitted by education, training, or experience as of February 13, 2023.  *See, e.g.*, *Dykman v. Life Ins. Co. of N. Am.*, No. 3:20-CV-01547-IM, 2021 WL 5206666, at *11 (D.Or. Nov. 8, 2021).

Next, on December 7, 2022, Unum requested clarification from Dr. Hernandez-Peraza regarding Scorzo's work capacity within occupational demands and asked whether she could perform on a full-time basis sedentary demands requiring exertion of up to 10 pounds and frequent reaching (desk level), handling, and fingering; as well as frequent near acuity, occasional far acuity, and color vision.  (Dckt. 34-6 at 74).  In her response, Dr. Hernandez-Peraza put an "X" next to "No" and stated, "[h]er attention & cognitive deficits make this difficult for function."  (*Id.* at 113).  Unum also sought clarification as to Scorzo's current restrictions (namely, what activities she should not do and what she could not do) but Dr. Hernandez-Peraza did not provide an answer to this question.  (*Id.*).

25

Finally, in January 2023, Dr. Hernandez-Peraza responded to a letter that Dr. Leverett sent on behalf of Unum and marked "no" when asked whether Scorzo "had the functional capacity to perform the occupational demands" of sedentary work. (Dckt. #34-6 at 145). Dr. Hernandez-Peraza further noted that Scorzo's "memory impairments [we]re most likely secondary to MS," and that she was "unable to certify if [Scorzo] would be able to learn a new task and perform the occupational demands of full time [work]." (*Id.*).

In sum: although Scorzo asserts that Dr. Hernandez-Peraza has "consistently opined and observed that *her MS symptoms prevent her from working in any capacity*," (Dckt. #32 at 7) (emphasis added), the evidence that she cites in support of this conclusion does not support it. For example, Dr. Hernandez-Peraza's inability to certify that Scorzo could learn a new task and work full-time is not tantamount to an opinion that Scorzo was unable to perform the duties of any gainful occupation for which she was reasonably fitted by education, training, or experience, as the Policy requires. At most, Dr. Hernandez-Peraza's terse denial in December 2022 that Scorzo was unable to perform full-time sedentary work with certain exertional requirements, and her uncertainty in January 2023 about whether Scorzo was able to work, raise doubts about whether Scorzo was unable to perform "any gainful occupation." But binding precedent requires that any such doubts must be resolved against Scorzo for purposes of determining whether she is entitled to benefits under the Policy's general disability provision. *See, e.g.*, *Cheney*, 831 F.3d at 451; *Dorris*, 949 F.3d at 304. As such, the Court finds that Dr. Hernandez-Peraza's opinions do not provide a sufficient evidentiary basis to support a finding that Scorzo's MS rendered her unable to perform the duties of any gainful occupation as of February 13, 2023.

### b.     The Opinions of Unum's Reviewing Physicians

Unum's four reviewing physicians—Drs. Kohli, Leverett, Cohen, and Geraci—all concluded that Scorzo's MS and her MS-related impairments did *not* prevent her from performing the demands of a sedentary-level occupation identified by two vocational experts, particularly one that was limited to mostly sitting, exertion up to ten pounds of force occasionally, frequent reaching at desk level, handling, and fingering, frequent near acuity, frequent accommodation, occasional far acuity, and color vision. *See supra* Section II(B)(2). Moreover, Unum's reviewing doctors had several criticisms of Dr. Hernandez-Peraza's opinions. For instance, Dr. Leverett acknowledged Dr. Hernandez-Peraza's neurology opinions, but concluded that they were "not well supported by medically acceptable clinical standards, laboratory or diagnostic techniques and [we]re inconsistent with the other substantial evidence in the file." (Dckt. #34-1 at 9). Similarly, Dr. Geraci opined that the "neuropsychological testing contradict[ed] Dr. Hernandez-Peraza's opinion." (*Id.* at 140). In contrast to Dr. Hernandez-Peraza's terse, conclusory opinions about Scorzo's capabilities, the Court finds the more fulsome opinions of Unum's reviewing physicians to be well-reasoned and supported by the medical record.

### i.     Scorzo's Criticisms of Unum's Reviewing Physicians Are Unpersuasive.

Scorzo faults Unum for using doctors who performed "file-only medical reviews" of her claims. (Dckt. #42 at 9). However, where, as here, the opinions of the treating physicians contradict the opinions of non-treating physicians, the Supreme Court instructs that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician" and may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's

27

evaluation." *Black & Decker Disability Plan*, 538 U.S. at 834. Indeed, as the Seventh Circuit has held, doctors who perform file reviews "are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation." *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 577 (7th Cir. 2006). As such, the fact that Drs. Kohli, Leverett, Cohen, and Geraci did not personally examine Scorzo does not require the Court to disregard their opinions.

Scorzo also theorizes that Unum's in-house doctors have, by virtue of their employment with Unum, an inherent conflict in every case, including hers. But Scorzo does not point to any specific facts in this case which show that Unum's in-house doctors—i.e., Drs. Kohli, Leverett, and Cohan—were incentivized to derail her claim. *See Davis*, 444 F.3d at 576 ("[T]he singular fact of working in-house does not disqualify a doctor from rendering an independent opinion any more than does paying an outside doctor to do the same."). Thus, on the facts of this record, the Court finds there is no reason to disregard the opinions of Unum's in-house doctors.

Scorzo next argues that Unum's reviewing doctors placed too much weight on normal findings while ignoring or minimizing results that Scorzo argues support a finding that she is disabled. The Court, however, does not see any evidence of such unwarranted cherry-picking. In fact, each doctor acknowledged Scorzo's history of MS and optic neuritis; her reports of cognitive issues; objective testing that indicated physical weakness and difficulties with cognitive function; and her reports of MS-related impairments such as fatigue, weakness, and loss of focus. (*See* Dckt. ##34-6 at 126–27; 34-7 at 5–8, 18–20, 134–36). But the doctors also noted that Scorzo's MRIs suggested there was no active disease, that she was not taking medication and refused DMTs, and that the diagnostic and neurological testing did not indicate limitations or restrictions that would prevent her from working a sedentary job. (*Id.*).

28

Scorzo further attacks the opinions of Drs. Leverett and Cohan based on her assertion that they "attributed [her] 2020 neuropsychological test results to anxiety and depression" rather than her MS. (Dckt. #42 at 12). In addition, Scorzo asserts that Dr. Leverett found she was capable of working before he reviewed the medical file. (*Id.*). Neither of these arguments is supported by the record. To the contrary, before he sent the letter to Dr. Hernandez-Peraza, and before he issued his written opinion, Dr. Leverett explained that he had "reviewed the file," which included Dr. Hernandez-Peraza's notes and opinions about Scorzo's condition. (Dckt. #24-6 at 149). Furthermore, Dr. Leverett noted that Scorzo was diagnosed with "mild cognitive impairment attributed to her MS," but found that that her "altered cognitive function" did not alone or in combination "rise to the level of impairment." (Dckt. #34-7 at 8). Dr. Cohan similarly explained that Scorzo's 2020 neurological testing "revealed mild neurocognitive disorder" and that her test results were "consistent with [Scorzo's] reported symptoms of anxiety and depression." (*Id.* at 19). In sum: neither Dr. Leverett nor Dr. Cohan attributed Scorzo's 2020 neurological test results to her anxiety and depression.

Finally, Scorzo expresses additional concerns with the opinion rendered by Dr. Geraci, but again mischaracterizes that opinion. For example, Scorzo takes issue with Dr. Geraci's conclusion that her cognitive symptoms were not "due to *significant* cognitive impairment on neuropsychological testing," (*id.* at 135) (emphasis added), but the results themselves indicate that Scorzo suffered from a *mild* neurocognitive disorder. Scorzo also attacks Dr. Geraci's opinion that her 2022 and 2023 MRI results as "not clinically relevant"—but again, what Dr. Geraci stated and later clarified was that the "fact [that Scorzo's] MRI brain imaging shows mild atrophy, which is often seen in patients with MS," was not "in and of itself" indicative of impairment. (*Id.* at 140).

29

### c. The Vocational Experts

Unum's consulting vocational experts Howard and O'Kelley expressed the opinion that Scorzo had the skills and capabilities to perform sedentary occupations with specified restrictions and limitations, including the following positions: employment interviewer; telemarketing supervisor; call center supervisor; and account supervisor. *See supra* Sections II(B)(3)(a) & (b). Although Scorzo expresses criticisms of the opinions rendered by Howard and O'Kelley, she mischaracterizes the record or fails to explain the relevance of her concerns.

For example, Scorzo argues that the vocational consultants' findings are inconsistent with the ALJ's opinion because the ALJ found Scorzo could only perform three occupations. That is not correct. The ALJ identified three "representative occupations" he believed Scorzo could perform based on her restrictions and he did not opine that those occupations (namely, mail clerk, merchandise marker, and office helper) were the *only* occupations she could perform. Scorzo also complains that: (1) O'Kelley issued his opinion before Unum obtained Dr. Geraci's opinion; (2) Howard relied on the report issued by Dr. Leverett; and (3) O'Kelley included proposed occupations that Howard did not include in her opinion. But Scorzo does not explain how any of these facts make the vocational consultant's opinions less trustworthy. For example, Howard opined that the occupation of an employment interviewer was "a" viable alternative option for Scorzo, and not the "only" viable alternative for her.

Scorzo further criticizes the vocational consultants because, according to Scorzo, it is not clear what resources the vocational consultants utilized to render their opinions. However, Scorzo has cited no authority supporting the proposition that a vocational consultant must list every source they relied on, particularly where they have indicated that they have reviewed the medical file. Finally, Scorzo criticizes the vocational consultants for not analyzing any cognitive

demands, but she has not pointed to what those cognitive demands should be. Nor has Scorzo pointed to any medical provider that identified specific cognitive restrictions and limitations that she would need to perform full-time work.

### d.     Scorzo's MRI and Examination Results

Scorzo looks to her MRI results to support her belief that she cannot work, repeatedly emphasizing that her findings were "stable." (Dckt. #42 at 3). But the MRIs demonstrate far more than the "stability" of Scorzo's disease. The medical professionals' review of Scorzo's MRIs found "no findings to suggest active disease," (Dckt. #34-5 at 55), and that the MRIs were "negative for signal change to localize active demyelination," (Dckt. #36 at 31). Furthermore, as Dr. Geraci explained, the atrophy shown in Scorzo's MRIs is not indicative of an inability to work. (Dckt. #34-7 at 135). Rather, the "mild atrophy . . . is often seen in patients with MS, and is not, in and of itself, a marker for disease activity, symptoms, or impairment." (*Id.*).

### e.     Scorzo's Self-Reported Symptoms

Scorzo further argues that her self-reported MS-related symptoms—including, among other things, fatigue, muscular pain, weakness, numbness and tingling, and cognitive difficulties—are sufficient to demonstrate she is disabled and therefore entitled to benefits under the Policy. Although subjective reports can suffice to show one's disability under ERISA in some circumstances, *see Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003), such reports are not "a trump card" and it is instead "[t]he record as a whole [that] matters." *Canter v. AT&T Umbrella Benefit Plan No. 3*, 33 F.4th 949, 957 (7th Cir. 2022).

In this case, the record as a whole reflects a mixed picture that counterbalances Scorzo's self-reports of subjective symptoms. In particular, the record contains evidence that Scorzo

31

presented on occasion with no active symptoms; she continuously refused disease modifying

therapies (DMTs); and she elected not to receive medicine despite her continued reports of MS-

related symptoms.  As Dr. Geraci observed, the fact that Scorzo "repeatedly decline[d DMTs] . .

. indicat[es] a benign course of [MS]." (Dckt. #34-7 at 139–40).[3]  Dr. Geraci further

acknowledged that Scorzo stated that "she ha[d] issues with short-term and long-term memory

loss," but found that these statements were "refuted by normal mental status examinations and

the neuropsychological testing in October and November 2020." (*Id.* at 140).  Similarly, Dr.

Cohan took note of Scorzo's "multiple conditions" as well as her "self-reported symptoms," but

ultimately determined that "the physical examination and diagnostic findings d[id] not identify a

significant abnormality that would rise to the inability to function within the outlined

occupational demands which are performed at a sedentary level." (*Id.* at 19).  Moreover, Dr.

Hassanzadeh explained, Scorzo had no "clinical activity" for MS "despite being off

med[ications]." (Dckt. #36 at 28).

Notwithstanding all of this, Scorzo argues that her "low intensity of treatment" does not

support a finding that she is capable of a gainful occupation because Unum paid her benefits for

twenty-four months while she "attended treatment with the same regularity." (Dckt. #42 at 7).

This argument ignores the Policy's two-tiered definition of disability that becomes more rigorous

after twenty-four months.  Simply put, the unfortunate fact that Scorzo has MS and was unable to

perform the duties of her position as a Starbucks store manager does *not* mean that she was

unable to "perform the duties of any gainful occupation" within the meaning of the Policy's

---

[3] Scorzo defends her choice to refuse medication to treat MS despite her doctors' repeated recommendations.  (Dckt. #31 at 7–8).  Whatever Scorzo's reason for not taking DMTs, as Unum points out and Dr. Geraci opined, "her choice to refuse recommended treatment is indicative of the lack of severity of her condition." (Dckt. #42 at 7).

general disability policy. *See Dykman*, 2021 WL 5206666, at *11 (finding that claimant was disabled under the first period of a plan, but noting that the court was "unwilling to make the inferential leap required to find that [claimant] is disabled under the 'any occupation' standard").[4]

In sum: although the Court does not dismiss Scorzo's subjective complaints, it finds that they are not sufficient in consideration of the record as a whole to show that Scorzo could not perform any gainful occupation. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir. 2007) ("Considering such subjective complaints however, does not mean that they are to be dispositive of a claimant's entitlement to benefits.").

**f.**     **The ALJ's November 28, 2022 Opinion Denying Scorzo's Claim for Social Security Disability Benefits**

As discussed above, an ALJ issued a decision denying Scorzo's claim for social security disability benefits on November 28, 2022, less than three months before Unum discontinued her benefits. A Social Security decision is one factor for consideration in an ERISA benefits determination, *see Dorris*, 949 F.3d at 305, and the decision in Scorzo's Social Security case weighs against her claim for further disability benefits under the Policy. In particular, although the ALJ recognized that Scorzo had relapsing remitting MS and that she was unable to perform the duties of her past relevant work, the ALJ found that she had the functional capacity to

---

[4] In her reply, Scorzo asserts that Unum's "conduct is conspicuously similar to a case [recently] decided against it . . . involving a claimant with relapsing-remitting M.S." (Dckt. #42 at 5 (citing *Akans v. Unum Life Ins. Co. of Am.*, No. 3:23-CV-79, 2024 WL 1200301 (E.D.Tenn. Mar. 20, 2024)). However, *Akans* is factually distinguishable. Although the disability insurance policy in that case (like here) had a "regular occupation" standard and a "gainful occupation" standard, the "gainful occupation" standard in that case (unlike here) had a defined "gainful" wage that the sedentary occupations available to the claimant did not provide. *Akans*, 2024 WL 1200301 at *7. Consequently, both Unum and the court evaluated claimant's claim under the "regular occupation" standard, (*id.*), and not under the "gainful occupation" standard that is applicable here. Moreover, the claimant's claim in *Akans* was bolstered by the fact that, unlike here, the Social Security Administration approved his claim for Social Security Disability Benefits. *Id.* at *2.

perform alternative "representative occupations," including mail clerk, merchandise marker, and office helper. (Dckt. #36-4 at 98). Furthermore, as Scorzo acknowledges, each of these positions paid a median annual wage that was more than 60% of what Scorzo characterizes as her "gainful annual wage" ($51,292.80). (Dckt. #32 at 15).[5]

\* \* \* \*

In sum: in consideration of the record as a whole, the Court finds that Scorzo has failed to prove by a preponderance of the evidence that she is unable to perform the duties of any gainful occupation for which she is reasonably fitted by education, training or experience as of February 13, 2023. Accordingly, the Court denies Scorzo's motion for judgment and grants Unum's cross-motion for judgment.

### CONCLUSION

For all of the above reasons, the Court denies Scorzo's motion for judgment, (Dckt. #30), and grants Unum's cross-motion for judgment, (Dckt. #37).

**Date: July 17, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

---

[5] Scorzo reports that the median annual wage for these jobs is as follows: mail clerk ($35,070); merchandise maker ($35,380); and office helper ($38,660). (Dckt. #32 at 15). These median wages exceed the 60% threshold of Scorzo's self-described gainful wage of $51,292.80 ($30,775.68).